T.C. Memo. 1999-92


UNITED STATES TAX COURT


LOUIS A. FILIOS AND ESTATE OF EMMA L. FILIOS,
DECEASED, LOUIS A. FILIOS, EXECUTOR, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15719-96.                    Filed March 25, 1999.


Lawrence J. Casey, Scott E. Bettencourt, and John P. Ockerbloom, for petitioners.

Melanie M. Garger, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, Judge:  Respondent determined deficiencies in petitioners' 1992 and 1993 Federal income tax and an accuracy-related penalty as follows:

| Year | Deficiency | Penalty under Sec. 6662 |
|------|-----------|-------------------------|
| 1992 | $194,121  | $38,824 |
| 1993 | 133,807   | 26,761 |

After concessions, the issues for decision are:

1.  Whether petitioner operated his horse racing and breeding activity for profit in 1992 and 1993.  We hold that he did not.

2.  Whether petitioners are liable for the accuracy-related penalty for negligence under section 6662 for 1992 and 1993.  We hold that they are not.

Section references are to the Internal Revenue Code for the years in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.  References to petitioner are to Louis A. Filios.

## I.  FINDINGS OF FACT

### A.  Petitioners

Petitioners were married and lived in West Springfield, Massachusetts, when they filed the petition in this case.[1] Petitioner was 92 years old at the time of trial.

Petitioner was born in Italy in 1905 and moved to the United States when he was 4 years old.  He studied engineering for 2 years at Ohio State University.  After attending college, he worked 3 years for Fafner Bearing Co., and later for a company which produced metal products.

---

[1] Emma L. Filios died on Mar. 12, 1997, after the petition was filed.  Petitioner is executor of the Estate of Emma L. Filios.

B.  <u>Westfield Gage Co.</u>

Petitioner founded and incorporated Westfield Gage Co. (Westfield Gage), in Westfield, Massachusetts, in 1955.  He has been its president and sole shareholder since then.  Westfield Gage manufactures precision parts for airplanes and jet engines.

Petitioner generally worked 7 or 8 hours per day at Westfield Gage.  He never (1) prepared a written business plan, (2) conducted economic or business studies, or (3) hired consultants for Westfield Gage.  Westfield Gage's treasurer prepared budgets when the corporation was having financial problems.

Westfield Gage was successful.  It had total taxable income of $8,842,137 from 1979 to 1993.  It had gross receipts of $10,523,177 in 1992 and $9,707,359 in 1993 and net profits of $972,058 in 1992 and $102,470 in 1993.

Pratt and Whitney, Westfield Gage's primary customer, once asked Westfield Gage to cut its prices 10 percent.  Petitioner did so and Westfield Gage started to lose money.  Petitioner complained to Pratt and Whitney, so Pratt and Whitney gave Westfield Gage overhaul and repair work.  The overhaul and repair work was profitable and became a major activity for Westfield Gage.

C.  <u>Mary Kuta</u>

Mary Kuta (Kuta) was Westfield Gage's bookkeeper from 1955 to 1992.  She kept Westfield Gage's books and records, filed its quarterly tax returns, and prepared its payroll.

D.    Eugene Kida

Eugene Kida (Kida) worked for Westfield Gage from 1984 to 1995.  He is a certified public accountant (C.P.A.) and has a master's degree in Business Administration.

Kida prepared petitioners' personal income tax returns while he worked for Westfield Gage.  To prepare petitioners' income tax returns, Kida reviewed Kuta's horse racing and breeding records.  Kida reviewed petitioners' tax returns with petitioner each year.

E.    Petitioner's Horse Racing and Breeding Activity

1.    General

Petitioner bought his first thoroughbred horse in 1955.  Petitioner kept a horse 3 or 4 years after it was born so he could decide whether he thought it would race successfully.  Petitioner's best horses generally ran in races paying purses from $12,000 to $30,000.

Petitioner never trained or stabled any of his horses at or near his home in West Springfield.  He did not own a farm or any equipment used in his horse activity.  Petitioner rode horses at riding stables or riding schools near his home.  He and the members of his family did not ride his horses.

2.    Horse Publications

Petitioner subscribed to various horse industry publications including The Blood Horse and Thoroughbred Record from 1959 through the years in issue.  He read many horse racing and breeding books and magazines.  He also read The Blood Horse Stallion Register, which was published annually.  It contains

information about thoroughbred stallions, such as pedigrees, racing records, and racing earnings.  Petitioner used The Blood Horse Stallion Register to decide which horses to breed and which to buy.

### 3.   Vitamin and Mineral Supplements

Initially, petitioner did not have high quality horses.  He believed that giving his horses vitamin and mineral supplements would make them successful.  He decided which vitamins and minerals to use, mixed them, and sent them to the trainers to give to the horses.  However, petitioner did not keep records showing which vitamins or minerals he gave to each of his horses or the nutrition and diet of each horse.

### 4.   Breeding and Training

Petitioner spent 10 to 20 hours per week on his horse racing and breeding activity.  He attended horse auctions to buy and sell horses.  He talked to breeders and visited the farms in Kentucky and tracks in New Jersey where he stabled some of his horses.  Petitioner sometimes went to the New Jersey facilities each week, but usually he went less often.  Petitioner reviewed mail that he received relating to his horse racing and breeding activity.

Kuta prepared and petitioner signed checks to pay bills for his horse racing and breeding activity.  He signed all checks relating to the activity and reviewed all of the track purse and race results.

Petitioner went to England, France, and Germany in 1977 on a tour of breeding farms, race tracks, and training centers sponsored by Cornell University. Petitioner also toured similar facilities in Ireland on a date not specified in the record. He took courses about horses at Cornell University in 1985, 1986, and 1990, and stud manager's courses in 1964 and 1970.

From 1961 to 1996, petitioner gave away 124 horses that were not performing well because it cost too much to maintain them.

5.   Records and Reports

Westfield Gage (not petitioner) paid Kuta to keep the records for petitioner's horse racing and breeding activity from 1955 through the years at issue. She spent 10 to 15 percent of her time working on the horse racing and breeding activity. Some of that time was at the end of each year when she gathered information for petitioner's tax returns. Kuta decided which records of the horse racing and breeding activity to keep and how to keep them.

Petitioner had a separate bank account for his horse racing and breeding activity from 1963 through the years in issue. Kuta kept copies of canceled checks, check registers, invoices, and correspondence that related to the horse racing and breeding activity.

At the end of each year, Kuta prepared summaries from race track statements to ensure that the Forms 1099 issued by the racetracks were accurate. She also used race track statements to

ensure that the various expenses charged to petitioner by the tracks, such as jockey fees and photograph fees, were correct.

Kuta kept copies of (a) invoices from petitioner's trainers and from farms where his horses were stabled, and (b) statements from racetracks at which his horses raced showing the race dates, his horses' standing in those races, and the total amounts that his horses won. Kuta did not regularly prepare records showing how much each horse earned. In a few of the years before the years in issue, Kuta prepared a summary at the end of the year showing the earnings of each horse.

From 1959 to 1989, Kuta prepared spreadsheets which showed expenses of the horse racing and breeding activity by category. Kuta usually prepared the spreadsheets from the checkbook for the activity at the end of the year. In some years she listed disbursements chronologically; in other years she listed them by payee. The disbursement spreadsheets did not segregate expenses by horse. Kuta used the spreadsheets to know where money was being spent and to give to the accountant to prepare petitioner's tax returns.

From 1990 to the time of trial, Kuta prepared the spreadsheets on a personal computer. Kuta could not use the computer to generate a report that showed petitioner's expenses for each horse. The spreadsheets did not include information about receipts.

Kuta prepared index cards on most of petitioner's horses from around 1956 through the time of the trial which showed the

name of the horse, its year of birth, its sire and dam, when petitioner acquired it and from whom, the purchase price, when petitioner disposed of the horse, and the name of the party acquiring the horse. Some index cards showed whether the horse had a jockey certificate number, which the horse needed in order to be eligible to race. Kuta prepared the index cards in part to show Kida which horses were depreciable and which were home-bred.

From 1974 to 1996 (excluding 1994), Kuta prepared yearly breeding schedules for petitioner's mares. These schedules generally included the name of each mare available for breeding, the name of the stallion to which it was being bred, and the breeding fee. If the mare was still carrying a foal from the prior year's breeding, the schedule gave the name of the stallion. Kuta prepared the breeding schedules to ensure that she had properly registered the foals and paid breeding fees and to determine whether a refund was due.

From about 1986 to 1997 (excluding 1994), Kuta kept annual records which identified the location of most of petitioner's horses each month and whether petitioner disposed of the horse during the year. Kuta kept these records to ensure that petitioner was billed correctly.

Petitioner never conducted any written economic or business studies, prepared a written business plan or budget for his horse racing and breeding activity, or hired any consultants to help him make his horse racing and breeding activity profitable.

6. Petitioner's Reliance on Others

Petitioner used professional trainers, veterinarians, horse farms, breeders, auctioneers, and jockeys. Petitioner hired four to nine trainers each year from 1985 to 1993. The trainers cared for, fed, and trained the horses.

Petitioner called the trainers on the telephone, sometimes once a week, sometimes once or twice a day. Petitioner talked to his trainers about which horses to race and which horses to train. He asked their opinion, and if it sounded logical he told them to go ahead.

Petitioner did not require his horse trainers to submit plans of operations or reports. The only written reports that the trainers submitted to petitioner were notes they occasionally made on their invoices. For example, trainer George Handy made the following note on his May 1992 invoice:

Hi Louie.

Colts are progressing ok., Morgan Rd seems to learn much faster than Go Go Tiger, both are galloping 1 ½ each day now.
Hope you don't mind my bill arriving early but I have ran out of cash Flo + my Mortgage + Feed bills etc. are due on the first of June so if you send my check in return mail I would really appreciate it. Thank you.

Best Regards.
George

P.S. Thank you for our Vitamins. They are the Best.

Petitioner did not rely on a trainer or breeder when he decided which horses to breed. He arranged for his mares to be bred. Petitioner did not keep records regarding the performance or race results of petitioner's trainers.

7.  Petitioner's Breeding and Herd Management Program

Petitioner increased the size of his herd from 1955 to 1975. His herd grew to a high of 84 horses in 1990.

In the mid-1970's, petitioner began to send his mares to be bred to Kentucky stallions which had excellent pedigrees but unproven racing records.  Petitioner continued to believe vitamins and minerals were important.

In 1986, petitioner bought a broodmare, Luna Rutera, for $70,000.  Luna Rutera suffered a tear in her cervix which prevented her from giving birth.  Petitioner gave Luna Rutera away in 1994.

In 1990 or 1993, petitioner began to use stallions with proven pedigrees and race performance, such as Dr. Carter, Summer Squall, Cryptoclearance, and Carson City.

8.  Prior Examinations

Respondent audited petitioners' 1977 Federal income tax return in 1980 and 1984 return in 1987.  Respondent made no adjustments to those returns.  Kida represented petitioner in those audits.  Petitioner repeatedly told Kida that his horse activity was a business and that petitioner intended to make a profit.  Kida believed that petitioner's horse racing and breeding activity was a business.

F.  Petitioners' Income Tax Returns

Petitioners reported the horse racing and breeding activity on their joint Federal income tax returns each year from 1957 through the years in issue.  The following chart shows the

amounts of gross receipts, expenses, and losses that petitioners

reported on Schedules C from 1957 to 1993:

| Year | Gross receipts | Expenses | Losses |
|------|---------------|----------|--------|
| 1957 | None | $12,919.36 | $12,919.36 |
| 1958 | 5,575.00 | 25,268.34 | 19,693.34 |
| 1959 | 7,729.00 | 45,809.97 | 38,080.97 |
| 1960 | 4,805.00 | 53,429.56 | 48,624.56 |
| 1961 | 19,345.00 | 56,677.46 | 37,332.46 |
| 1962 | 4,280.00 | 48,705.54 | 44,425.54 |
| 1963 | 5,630.00 | 48,674.38 | 43,044.38 |
| 1964 | 25,666.00 | 56,735.85 | 31,069.85 |
| 1965 | 28,506.00 | 50,189.20 | 21,683.20 |
| 1966 | 34,717.00 | 58,908.42 | 24,191.42 |
| 1967 | 33,895.50 | 71,575.82 | 37,680.32 |
| 1968 | 43,903.70 | 79,234.31 | 35,330.61 |
| 1969 | 32,353.00 | 74,010.00 | 41,657.00 |
| 1970 | 35,722.00 | 69,917.00 | 34,195.00 |
| 1971 | 23,499.00 | 55,394.00 | 31,895.00 |
| 1972 | 19,637.00 | 51,524.00 | 31,887.00 |
| 1973 | 12,544.40 | 60,650.27 | 48,105.87 |
| 1974 | 21,347.00 | 77,845.15 | 56,498.15 |
| 1975 | 27,320.64 | 100,913.06 | 73,592.42 |
| 1976 | 44,028.00 | 118,674.00 | 74,646.00 |
| 1977 | 21,140.00 | 102,571.00 | 81,431.00 |
| 1978 | 58,662.00 | 132,278.00 | 73,616.00 |
| 1979 | 89,971.00 | 161,913.00 | 71,942.00 |
| 1980 | 60,651.00 | 180,943.00 | 120,292.00 |
| 1981 | 127,225.00 | 207,589.00 | 80,364.00 |
| 1982 | 78,804.00 | 213,686.00 | 134,882.00 |
| 1983 | 111,853.00 | 284,373.00 | 172,520.00 |
| 1984 | 106,814.00 | 354,937.00 | 248,123.00 |
| 1985 | 124,671.00 | 471,417.00 | 346,746.00 |
| 1986 | 111,295.00 | 545,642.00 | 434,347.00 |
| 1987 | 178,776.00 | 615,973.00 | 437,197.00 |
| 1988 | 136,327.00 | 672,014.00 | 535,687.00 |
| 1989 | 204,403.00 | 757,630.00 | 553,227.00 |
| 1990 | 116,400.00 | 774,735.00 | 658,335.00 |
| 1991 | 145,405.00 | 814,477.00 | 669,072.00 |
| 1992 | 136,463.00 | 814,103.00 | 677,640.00 |
| 1993 | 234,588.00 | 807,259.00 | 572,671.00 |
| Total | 2,473,951.24 | 9,128,595.69 | 6,654,644.45 |

Of the expenses from 1957 to 1993, $479,210 was attributable to depreciation.

## II.  OPINION

A.  <u>Whether Petitioner Operated His Horse Racing and Breeding Activity for Profit in 1992 and 1993</u>

The issue for decision is whether petitioner operated his horse racing and breeding activity for profit in 1992 and 1993.

An activity is conducted for profit if it is conducted with an actual and honest profit objective.  <u>Osteen v. Commissioner</u>, 62 F.3d 356, 358 (11th Cir. 1995), affg. in part and revg. on other issues T.C. Memo. 1993-519; <u>Surloff v. Commissioner</u>, 81 T.C. 210, 233 (1983); <u>Dreicer v. Commissioner</u>, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983).  In deciding whether petitioner operated his horse racing and breeding activity for profit, we apply the nine factors listed in section 1.183-2(b), Income Tax Regs.  The factors are:  (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his or her advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.  No single factor controls.  <u>Osteen v. Commissioner</u>, <u>supra</u>; <u>Brannen v.</u>

Commissioner, 722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); sec. 1.183-2(b), Income Tax Regs. Petitioners have the burden of proof on this issue. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).

B. Application of the Factors

1. Manner in Which the Taxpayer Conducts the Activity

Maintaining complete and accurate books and records, conducting the activity in a manner substantially similar to comparable businesses which are profitable, and making changes in operations to adopt new techniques or abandon unprofitable methods are factors which may indicate that a taxpayer conducted the activity for profit. Engdahl v. Commissioner, 72 T.C. 659, 666-667 (1979); sec. 1.183-2(b)(1), Income Tax Regs.

Harry L. Landry (Landry), petitioners' expert, testified that petitioner's recordkeeping was better than what he usually saw for horse activities. Petitioners contend that petitioner operated his horse racing and breeding activity in a businesslike manner because he had a separate bank account and kept detailed financial and breeding records for the activity. We disagree. Petitioner did not have budgets, income statements, balance sheets, income projections, or financial statements for the activity other than those compiled annually by petitioners' accountant to prepare their annual Federal tax returns.

Petitioners contend that petitioner tried four different approaches to succeeding at his horse racing and breeding

activity from 1955 to 1993, and that his use of these different approaches shows that petitioner had a profit motive.  Landry testified that petitioner:  (a) Emphasized vitamins and minerals without regard to bloodlines and racing success; (b) increased the number of horses; (c) used improved bloodlines with unproven racing success; and (d) used improved bloodlines with proven racing success.

The use of vitamins was not a change in how petitioner operated.  Petitioner adhered to that idea from 1955 through the years in issue.  Petitioner increased the size of his herd from 1955 to 1975, but that was not a change in how he operated.

Around 1976, petitioner began to breed his horses to stallions which had improved bloodlines and unproven racing records.  Petitioner continued to use stallions with improved bloodlines and unproven racing records through the years in issue.  Petitioners contend that in 1990 or 1993 petitioner changed his methods by breeding his horses to horses with excellent pedigrees and proven racing records.  Petitioners also contend that the facts that petitioner occasionally changed trainers and breeders, that he decided which horses to buy, and that he gave away horses to cut costs, show that he intended to make a profit.

We disagree.  Petitioner's method of operations generally continued unchanged for more than 30 years.  Petitioner never sought advice on how to make his horse activity profitable, and

he did not abandon unprofitable methods.  He offered no evidence of how comparable profitable businesses worked.

Petitioners contend that petitioner operated his horse racing and breeding activity for profit because he operated Westfield Gage and his horse activity in the same manner.  We disagree.  Petitioner did not operate Westfield Gage and his horse activity in the same manner.  He said that if Westfield Gage had lost money, he would have gotten advice on how to fix it.  When Westfield Gage began to lose money because Pratt and Whitney asked him to lower his charges to them, petitioner convinced Pratt and Whitney to give Westfield Gage additional business so that it could again be profitable.  Petitioner took no similar action to try to make his horse activity profitable.

Petitioners contend that petitioner operated his horse racing and breeding activity like the taxpayer did in Arwood v. Commissioner, T.C. Memo. 1993-352.  We disagree.  The taxpayer in Arwood v. Commissioner, supra, had losses from 1981 to 1987.  However, he had a written business plan which he adjusted in response to changed circumstances, and he consulted and relied on experts for business and financial advice.  He believed that his horses would be profitable because his horse's half-brother received $10,000 per breeding and the sire of his horse received $40,000 per breeding.  Petitioner did not have a written plan or financial analysis of the profit potential of his activity.

This factor favors respondent.

2. The Expertise of the Taxpayers or Their Advisers

Efforts to gain experience and a willingness to follow expert advice are considered in deciding if a taxpayer has a profit objective. Sec. 1.183-2(b)(2), Income Tax Regs. Preparation for an activity by extensive study of its practices or by consultation with experts may indicate that a taxpayer has a profit motive if the taxpayer follows that advice. Sec. 1.183-2(b)(2), Income Tax Regs.

Petitioners contend that petitioner's self-education and reliance on others show that he had a profit objective. We disagree. Petitioners did not show that petitioner studied successful business and economic practices with respect to breeding and racing horses. Petitioner used reputable professional horse trainers. However, they did not advise petitioner how to make a profit. The fact that petitioner did not seek advice on the economic aspects of his activity suggests that he lacked a profit motive. See Rinehart v. Commissioner, T.C. Memo. 1998-205 (horse activity owner employed horse professionals but not for business advice). This factor favors respondent.

3. Taxpayer's Time and Effort

The fact that a taxpayer devotes much time and effort to conducting an activity may indicate that he or she has a profit objective. Sec. 1.183-2(b)(3), Income Tax Regs. Petitioner spent 10 to 20 hours a week on his activity. He did not show that a profitable horse activity could be successfully operated

by an individual devoting 10 to 20 hours a week on the activity. This factor is neutral.

4. <u>Expectation That Property Used in the Activity Would Appreciate in Value</u>

A taxpayer may intend, despite the lack of profit from current operations, that an overall profit will result when appreciation in the value of assets used in the activity is realized. <u>Bessenyey v. Commissioner</u>, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967); sec. 1.183-2(b)(4), Income Tax Regs. There is an overall profit if net earnings and appreciation are sufficient to recoup losses sustained in prior years. <u>Bessenyey v. Commissioner</u>, <u>supra</u>.

Petitioners contend that petitioner expected his horses to appreciate in value. We disagree. Petitioner did not show that the value of his horses and their offspring would appreciate enough to offset his losses. This factor favors respondent.

5. <u>Taxpayer's Success in Other Activities</u>

The fact that a taxpayer has previously engaged in similar activities and made them profitable may show that the taxpayer has a profit objective, even though the activity is presently unprofitable. Sec. 183-2(b)(5), Income Tax Regs.

Petitioner successfully built Westfield Gage, but he did not show how his success with Westfield Gage relates to his ability to conduct a profitable horse racing and breeding activity.

This factor favors respondent.

6.    Taxpayer's History of Income or Losses

A history of substantial losses may indicate that the taxpayer did not conduct the activity for profit. Golanty v. Commissioner, 72 T.C. at 427; sec. 1.183-2(b)(6), Income Tax Regs. A taxpayer may have a profit objective even when the activity has a history of losses. Bessenyey v. Commissioner, supra at 274. Losses during the initial stage of an activity do not necessarily indicate that the activity was not conducted for profit. Engdahl v. Commissioner, 72 T.C. at 669; sec. 1.183-2(b)(6), Income Tax Regs. We have said that the startup phase of a horse breeding activity may be 5 to 10 years. Engdahl v. Commissioner, supra.

Petitioner lost money in each of the 37 years from 1957 to 1993. In those years his income totaled $2,473,951 and his expenses totaled $9,128,596. Petitioners contend that we should not give much weight to the fact that petitioner had large losses for a long time because many of his losses were due to unforeseen circumstances. We disagree.

Losses due to unforeseen circumstances do not necessarily indicate that a taxpayer lacked a profit objective. See Phillips v. Commissioner, T.C. Memo. 1997-128; Briggs v. Commissioner, T.C. Memo. 1994-125; Leonard v. Commissioner, T.C. Memo. 1993-472. Petitioners contend petitioner would have made a large profit if he had not lost Luna Rutera as a broodmare. However, petitioners did not show that petitioner's horse racing and breeding activity would have been profitable if events beyond

petitioner's control, such as the discovery that Luna Rutera could not give birth, had not occurred. See Burger v. Commissioner, 809 F.2d 355 (7th Cir. 1987), affg. T.C. Memo. 1985-523 (taxpayer did not show that activity would have been profitable if the unforeseen circumstance had not occurred).

Petitioners contend that this case is like Patterson v. United States, 198 Ct. Cl. 543, 459 F.2d 487, 493 (1972), and Metcalf v. Commissioner, T.C. Memo. 1963-277 (profit motive found despite 24 years of losses). We disagree. The taxpayer in Patterson had a farm on which he initially tried to build a herd of Angus cattle. When that activity was unsuccessful, he switched to growing tobacco. Petitioner has not abandoned his horse racing and breeding activity.

The taxpayers in Metcalf operated a commercial dairy. To improve milk production, the taxpayers tried to develop three different purebred breeds of cattle (Brown Swiss, Angus, and Charolais). The taxpayers abandoned this attempt when it proved to be unsuccessful. Petitioner did not abandon his unprofitable activity.

This factor favors respondent.

7. Amount of Occasional Profits, if Any

We should consider the amount of any occasional profits the taxpayer earned from the activity in relation to the amount of losses incurred, the amount of the taxpayer's investment, and the value of the assets used in the activity. Sec. 1.183-2(b)(7), Income Tax Regs. Petitioner did not make a profit in any year

from his horse racing and breeding activity. His net losses from the activity were more than $6 million from 1957 to 1993.

A small chance to make a large profit may indicate that a taxpayer has a profit objective. Sec. 1.183-2(b)(7), Income Tax Regs. Landry testified that 3 to 5 percent of those in the horse racing and breeding activity make about $775 million. That does not establish that petitioner had a small chance to make a large profit, absent evidence showing what other horse operations did to become profitable.

Petitioners contend that a horse that petitioner had bred in 1995, Bent Creek City, was worth $1 million. Petitioners contend that this shows the potential of substantial profit from petitioner's horse activity. We disagree. Landry's estimate of Bent Creek City's value appears to be inflated; he testified that petitioner sold the horse in 1996 for $35,000.

This factor favors respondent.

8.   <u>Financial Status of the Taxpayer</u>

Substantial income from sources other than the activity, especially if the losses generate large tax benefits, may indicate that the taxpayer is not conducting the activity for profit. Sec. 1.183-2(b)(8), Income Tax Regs.

Petitioner concedes that he had a substantial amount of income from Westfield Gage at all times, but he contends that this factor is neutral because most of his losses were direct expenses requiring cash outlays. We disagree. Even if a taxpayer pays expenses out of pocket the potential tax benefits

from treating a hobby as a business may induce a taxpayer, who has enough income, to invest in that hobby where the taxpayer would not otherwise do so. Engdahl v. Commissioner, supra at 680.

This factor favors respondent.

9.    Elements of Personal Pleasure

The presence of recreational or personal motives in conducting an activity may indicate that the taxpayer is not conducting the activity for profit. Sec. 1.183-2(b)(9), Income Tax Regs. A taxpayer's enjoyment of an activity does not show that the taxpayer lacks a profit objective if the activity is, in fact, conducted for profit as shown by other factors. Jackson v. Commissioner, 59 T.C. 312, 317 (1972); sec. 1.183-2(b)(9), Income Tax Regs. However, if the possibility for profit is small compared to the possibility for gratification, the latter possibility may be the primary motivation for the activity. White v. Commissioner, 23 T.C. 90, 94 (1954), affd. per curiam 227 F.2d 779 (6th Cir. 1955).

Petitioners point out that neither petitioner nor his family rode his horses. Despite this, we think petitioner owned horses for 37 years, despite losing $6 million, because he enjoyed it. From petitioners' standpoint, this factor is at best neutral.

10.  Conclusion

We conclude that petitioner did not operate his horse racing and breeding activity for profit in 1992 and 1993.

C.  Whether Petitioners Are Liable for the Penalty Under Section 6662 for Negligence

Respondent determined that petitioners are liable for the accuracy-related penalty for negligence for 1992 and 1993 under section 6662.

Taxpayers are liable for a penalty equal to 20 percent of the part of the underpayment to which section 6662 applies.  Sec. 6662(a).  Section 6662 applies to an underpayment attributable to negligence.  Sec. 6662(b)(1).  Negligence includes a failure to make a reasonable attempt to comply with internal revenue laws or to exercise ordinary and reasonable care in preparing a tax return.  Sec. 6662(c).  The accuracy-related penalty does not apply to any part of an underpayment if the taxpayer shows that he or she had reasonable cause and acted in good faith.  Sec. 6664(c)(1).

Petitioner employed and relied on a C.P.A. who had represented petitioner in audits by respondent on the issue of whether petitioner operated the horse activity for profit. Petitioner's C.P.A. believed that petitioners properly deducted petitioner's horse activity expenses.  Petitioner had conducted his horse racing and breeding activity for more than 30 years when respondent audited petitioners in 1987 and made no changes. We conclude that petitioners are not liable for the accuracy-related penalty for negligence for deducting losses attributable to petitioner's horse racing and breeding activity in 1992 and

1993.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.